JOHN P. MERRICK, Petitioner-Appellant, *v.* CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO, as Exr. of the Estate of MAY AGNES MERRICK, Deceased, *et al.*, Respondents-Appellees.

(No. 56166; ▮▮▮)

First District (5th Division)—February 2, 1973.

106

Hardiman & Lynch, of Chicago, (A. J. Hardiman and George P. Lynch, of counsel,) for appellant.

Jack R. Davis, of Chicago, (Paul M. King, of counsel,) for certain appellee.

Kirkland & Ellis, of Chicago, (John E. Angle and David M. Burner, Jr., of counsel,) for other appellees.

Mr. PRESIDING JUSTICE DRUCKER delivered the opinion of the court:

John P. Merrick, hereinafter petitioner, filed suit to set aside the will of his sister, May Agnes Merrick, hereinafter the decedent. The respondents are the corporate executor, Continental Illinois National Bank and Trust Company, and the beneficiaries of decedent's estate. Many of the beneficiaries are Catholic Church affiliated organizations and their religious leaders.

Four allegations in the petition charged the Catholic Church and the religious leaders of its various organizations with undue influence and fraud in procuring their bequests. They were stricken for being insufficient in law. The other three allegations were to the effect that the will was improperly executed due to the lack of proper attestation and that the decedent lacked the requisite testamentary capacity at the time of execution. Summary judgment was entered in favor of the respondents as to these allegations.

On appeal petitioner contends that (1) the court erred in striking the allegations of fraud and undue influence; (2) the court erred in granting summary judgment in favor of respondents as to the allegations of improper execution and lack of testamentary capacity; (3) the petitioner was denied his right to adequate discovery; (4) the court erred in failing to construe Article IV of the will; and (5) the court erred in failing to enter an order of default as to certain respondents for failing to enter an appearance.

The facts follow:

The decedent died testate on January 20, 1970, at the age of 76. Her will, dated March 26, 1965, was admitted to probate on May 19, 1970. It first provided for the payment of debts, funeral expenses, costs of administration and estate taxes. Then, specific legacies totaling $12,000 were left to four Catholic organizations. A specific legacy of common stock was given to six other Catholic religious organizations, and specific legacies totaling $25,000 were given to seven lay individuals. This latter bequest included a $10,000 bequest to petitioner and $5,000 to his wife. All the decedent's personal effects were given to decedent's cousin and the residue to petitioner with substitute takers if he predeceased her.

The petition to set aside the will was filed on July 24, 1970. The subparagraphs which were stricken are as follows:

"(d) That at the time of the alleged * * * execution * * *, [the decedent] was under the influence, domination and control of certain priests and confessors, including Respondents, ARCHBISHOP OF CHICAGO, * * * REV. JAMES F. CUNNINGHAM, PASTOR OF ST. MARY'S CHAPEL AND PASTOR OF OLD SAINT MARY'S CHURCH; REV. EDWARD T. O'MEARA, NATIONAL DIRECTOR OF THE SOCIETY FOR THE PROPOGATION OF THE FAITH; REV. ROBERT YOUNGS, PASTOR OF ST. JOACHIM'S CHURCH; and BISHOP FULTON J. SHEEN, which deprived her of her free agency and the freedom of her will.

[This subparagraph was subsequently amended on June 15, 1971, to include: 'And that influence, domination and control was accomplished in part by Bishop Fulton J. Sheen while appearing on his and other television programs.']

(e) That the Catholic Church and [the respondents named in subparagraph (d)], teach * * * members of the Catholic Faith, including the decedent, that a testator would personally benefit after her death if bequests are made to the Catholic Church, or any Catholic religious group, and [the decedent] was under said delusion at the time of the alleged execution * * *. [This subparagraph was subsequently amended on June 15, 1971, to include: 'And that said teachings include bequests for masses.']

(f) That the Catholic Church [and the respondents named in subparagraph (d)] are and were using bequests for purposes unrelated to religious efforts * * * and said Respondents have fraudulently concealed these purposes from the members of the Catholic Faith, including the decedent, and the decedent would not have executed [the will] * * * if the said Respondents

had not fraudulently failed to disclose these purposes.

[This subparagraph was subsequently amended on June 15, 1971, to include: 'And that such purposes included the promotion of racial integration, anti-war activities, anti-abortion law activites and civil rights activites.']

(g) That the Catholic Church [and the respondents named in subparagraph (d)] have misrepresented to members of the Catholic Faith, including the decedent their true financial position and by so doing have fraudulently induced the decedent to make certain bequests which would not have been made by [her] if this financial information had not been fraudulently withheld from her."

On February 8 a hearing was held wherein the attorney for the executor moved to withdraw as the attorney of record for all of the other respondents named in the petition. He initially filed an appearance on behalf of all of them since he believed it was the executor's duty to uphold the will and the respondents, as beneficiaries, would all benefit if he was successful. The motion to withdraw was granted with leave to file an amended answer to the petition on behalf of the executor only. The amended answer was subsequently filed. Some of the respondents filed separate appearances, but others did not.

Petitioner's discovery efforts were discussed at the hearing. He had previously served a "Notice of Deposition" on the attorneys representing the executor and certain other respondents. The notice listed seven named individuals, two of whom were involved in the drafting or execution of the decedent's will. (Petitioner subsequently took their depositions.) The other five were clergymen. Petitioner submitted a series of 40 interrogatories to the executor and four clergymen. It not being clear that any of the clergymen had personal contact with the decedent during her lifetime or whether they were in any way involved in the procurement of her will, the court stated that the petitioner, in the first instance, should send each of them a few general interrogatories to determine if they knew the decedent at all. The court noted that if responses to these general interrogatories were positive, further discovery could be sought. Also, respondents' motion to strike subparagraphs (d) through (g), *supra,* was granted.

On March 12 another hearing was held wherein respondents' objections to 25 of petitioner's 40 interrogatories and petitioner's "Motion to Produce" certain correspondence and documents were sustained on the ground that the information sought therein was irrelevant to the issues remaining in the case, *i.e.,* the propriety of the manner in which the will was executed and the decedent's testamentary capacity. The judge

indicated that he would strike all 40 interrogatories and reiterated his position that a few general interrogatories should be sent in the first instance. The court allowed 15 interrogatories to stand only after counsel for the executor stated that he believed petitioner was entitled to them.

Petitioner's deposition was taken on March 30 and April 7. At the first deposition he stated that he had not been present when the decedent executed her will; that he was told by residents in the building in which she had lived that she did not sign the will in the presence of the three attesting witnesses. At the second deposition petitioner denied that he had previously stated that the will was not properly attested. When confronted with his original statement, he responded: "I don't think anyone told me that"; he had just been "surmising"; he had "no knowledge at all" as to the issue.

He further stated that the decedent has worked as a stenographer for the Illinois Central Railroad until she retired in 1963; at the time of her death she lived alone in a one-room apartment at 7000 South Lake Shore Drive. She cooked for herself, clothed herself, bought her own clothes, paid her own bills, maintained and personally handled three bank accounts, walked without the assistance of a cane, had good eyesight with her glasses on, attended church regularly, had been a devout Catholic all her adult life, had made gifts to the Catholic Church prior to her death and had never been under psychiatric care. Petitioner knew of no one who could testify as to the decedent's alleged mental incapacity.

Petitioner was also questioned as to the allegations of fraud and undue influence despite the fact that they had already been stricken. In relevant part he stated that the deceased had had no personal contact with the Archbishop of Chicago; that unnamed priests had told her that they needed money and that it would go for a good cause. Reverend James F. Cunningham had told her that his church, St. Mary's, needed money; petitioner did not dispute the truth of this statement. Reverend Edward T. O'Meara had done nothing to deprive the deceased of her free will but had sent her literature asking for money; it was the usual literature sent out by the church. Petitioner was asked what the church did to fraudulently conceal its true financial position from the deceased. Petitioner responded, "I wouldn't know."

On June 15 petitioner filed various motions. Relevant here are the following: a motion requesting the court to construe Article IV of the deceased's will; a motion to enter an order of default against various respondents for failing to file an appearance or responsive pleading, and that their bequests be stricken. Both motions were denied. Petitioner also filed the previously cited amendments to subparagraphs (d), (e) and (f) of the petition to set aside the will. Leave to file the amendments

was granted but the court struck the subparagraphs as amended. Summary judgment as to subparagraphs (a), (b) and (c) was entered in favor of the respondents.

*Opinion*

■ ■ ■ Defendant first contends that the court erred in striking subparagraphs (d), (e), (f) and (g) of the petition to set aside the will. Subparagraph (d) contains only the general allegation that the deceased was under the influence, domination and control of the named respondents "which deprived her of her free agency and the freedom of her will." This subparagraph is conclusory and therefore was properly stricken. As was stated in *Sterling v. Kramer*, 15 Ill.App.2d 230, 234, 145 N.E.2d 757:

> "[T]he general rule in Illinois [is that] * * * the pleading of undue influence in a will contest must contain a specific recital of the manner in which the free will of the testator was impaired at the time the instrument was executed. A mere conclusion that the testator was influenced by the persuasive or dominant nature of one of the beneficiaries is not sufficient."

(See *Heavner v. Heavner*, 342 Ill. 321, 174 N.E. 413.) The added allegation that the undue influence was, in part, a result of the deceased watching Bishop Fulton J. Sheen on television is of no aid to petitioner. He has failed to cite any authority to the effect that undue influence (according to its legally accepted meaning) may be imposed upon a testator over a nationwide commercial television program. We believe the proposition is without merit.

The allegations in subparagraphs (e), (f) and (g) are allegations of fraud. Subparagraph (e) charges various respondents with teaching the deceased that "a testator would personally benefit after her death" if bequests were made to the church, and that the deceased was under this "delusion" when she executed her will.

■ ■ At the February 8 hearing counsel for the executor argued that this allegation should be dismissed because even if such instruction were given, it would be impossible to prove that it was false. This would be a requisite element of proof in a fraud case. (See *Broberg v. Mann*, 66 Ill.App.2d 134, 139, 213 N.E.2d 89.) On appeal petitioner states that his real contention is that the alleged teaching was contrary to the true tenets of the Catholic faith and this is where the alleged fraud lies; he has cited an abundance of religious authorities in support of his point. Even if this were true—and we make no such decision—this is not what he pleaded, and he cannot assert a new theory on review. (*Benson v. Isaacs*, 22 Ill.2d 606, 610, 177 N.E.2d 209; *Broberg v. Mann*, 66 Ill.App.2d at 138.) The trial court properly struck subparagraph (e).

■■ Subparagraph (f) was also properly stricken. In the original petition it merely alleged that the respondents fraudulently concealed that the church used bequests for "purposes unrelated to religious efforts." This allegation was purely conclusory and it appears that the amendment to subparagraph (f) to the effect such purposes included "the promotion of racial integration, anti-war activities, anti-abortion law activities and civil rights activities" was an attempt to cure this defect. However, the listed activities are certainly recognized as ancillary to what might strictly be termed "religious efforts" and the alleged failure to disclose the partial use of church funds for such activities does not constitute fraud.

■■ Subparagraph (g) alleged that the Catholic Church and certain respondents misrepresented to its members and the deceased their true financial position and thereby "fraudulently" induced the deceased to make bequests she would otherwise not have made. Petitioner states in his brief that "the testator had a right to rely on these representations which were made by Respondents who were in a confidential relationship with the testator." However, the complaint does not allege the existence of a confidential relationship between the respondents and decedent. It was stated in *Bridge v. Newridge Chemical Co.*, 88 Ill.App.2d 337, 342, 232 N.E.2d 551, that:

> "Fraud is not presumed. The facts constituting the fraud must be clearly and explicitly alleged. Anderson v. Anderson, 339 Ill. 400, 171 N.E. 504 (1930). *The same rule applies to the existence of a confidential or fiduciary relationship.* Nechanicky v. Morton Park Federal Savings & Loan Ass'n., 32 Ill.App.2d 444, 178 N.E.2d 197 (1st Dist 1961)." (Emphasis supplied.)

Therefore the allegation was properly dismissed.

■■ We add that at petitioner's deposition, when asked what the church did to conceal its true financial position from the deceased, petitioner responded, "I wouldn't know." At other points during the deposition he conceded that the alleged misrepresentations consisted largely of the usual literature the church sends out noting its need for donations and requesting the same. Therefore, even if this allegation were improperly stricken, entry of summary judgment in favor of the respondents with respect thereto would have been proper.

Defendant's second contention is that the court erred in granting summary judgment in favor of the respondents as to subparagraphs (a), (b) and (c) which alleged that the will was improperly executed because the deceased failed to sign it in the presence of the attesting witnesses, and the deceased lacked testamentary capacity at the time of execution.

■■ It was stated in *In re Estate of Jensik*, 34 Ill.App.2d 130, 135, 180 N.E.2d 740, that:

"Summary judgment procedure is an important tool in the administration of justice. Its use in a proper case, wherein is presented no genuine issue as to any material fact, is to be encouraged. Allen v. Meyer, 14 Ill.2d 284, 292, 152 N.E.2d 576. The use of summary judgment procedure in the Probate Court where there is no genuine issue as to any material fact should be encouraged."

■■■ We believe that based upon the depositions of the petitioner that were before the court when summary judgment was entered, there was no genuine issue of material fact and that respondents were entitled to a judgment as a matter of law. See Ill. Rev. Stat. 1969, ch. 110, par. 57(3).

As to the alleged improper execution of the will, petitioner at his first deposition stated that unnamed persons who lived in the apartment building where the decedent resided told him that the will was not properly attested. At his second deposition he admitted that he had no personal knowledge concerning the issue; that no one had ever told him that the will was improperly executed. As to the allegations of lack of testamentary capacity, petitioner in effect admitted that the decedent was a healthy and normally functioning elderly woman at the time she executed her will. The requisite testamentary capacity has been found to exist under circumstances more adverse than those presented here. See *Quellmalz v. First Nat. Bank*, 16 Ill.2d 546, 158 N.E.2d 591.

Defendant's third contention is that he was denied the right to adequate discovery. He argues that his effort to gain discovery from various clergymen was frustrated by the court. We disagree. It was brought out during the hearings below that it was uncertain whether any of the clergymen who were the objects of petitioner's discovery efforts had any personal contact with the deceased during her lifetime; some of the respondents were clergymen of national prominence. Thus the court suggested that petitioner send them general interrogatories to determine if they did in fact know the deceased and, if so, in what capacity. If these were returned with answers indicating that further inquiry was called for, the court assured the petitioner of its cooperation. Petitioner never bothered to send these general interrogatories and was allowed to send 15 interrogatories out of a series of 40 submitted to the court only because the executor's attorney urged the court that he be permitted in doing so.

■■■ The trial judge has wide discretion in controlling the scope of discovery. (See *Cohn v. Board of Ed. Waukegan Tp.*, 118 Ill.App.2d 453, 456, 254 N.E.2d 803.) Petitioner was allowed to take the depositions of two men who were connected with the drafting and execution of the decedent's will. He was also permitted to take the deposition of two supervisors of the business at which the deceased was employed until

two years before her death. We have carefully reviewed the record as to petitioner's efforts to procure discovery from various clergymen and do not believe the court abused its discretion in regulating discovery proceedings as it did. See *People ex rel. Gen. Motors Corp. v. Bua*, 37 Ill.2d 180, 194, 226 N.E.2d 6.

■■ Petitioner next contends that the court erred in failing to construe Article IV of the will. This contention is without merit. This action was one to set aside a will. Petitioner's complaints and amendment thereto raised only the issues of improper execution, testamentary capacity, undue influence and fraud. The construction of Article IV of the will was simply irrelevant to the issues presented to the court and therefore it was not error for the court to deny petitioner's request for construction.

■■ Finally, petitioner contends that the court erred in denying his motion to enter an order of default as to certain respondents who failed to file an appearance. In support he cites Section 50(4) of the Civil Practice Act (Ill. Rev. Stat. 1969, ch. 110, par. 50(4)), which states that the court may enter a judgment of default for want of appearance or failure to plead. Section 5 of the Probate Act (Ill. Rev. Stat. 1969, ch. 3, par. 5) provides in relevant part that the Civil Practice Act shall apply to all proceedings covered by the Probate Act *"except as otherwise provided in this Act."* (Emphasis supplied.) Section 93 of the Probate Act (Ill. Rev. Stat. 1969, ch. 3, par. 93), which we deem governs here, provides:

> "It is the duty of the executor or the administrator * * * to defend a proceeding to contest the validity of the will. The court may order the executor or administrator * * * to defend or prosecute an appeal from the decree. In the event of the failure or refusal of the executor or administrator * * * to defend the proceeding or to defend or prosecute an appeal when ordered to do so by the court, the court upon its motion or on application of any interested party may appoint a special adimnistrator to defend or appeal in his stead."

■■ No cases directly on point have been cited by any of the parties nor have we found any during the course of our own research. However, we believe that the clear intent of Section 93 is to place the duty to defend a decedent's last testament on a specific person, *i.e., the executor*, administrator or special administrator as the case may be.

■■ An action to set aside a will is against the will itself and not the beneficiaries. (James Ill. Probate Law and Practice, § 90.3, and cases cited therein.) The beneficiaries under the will are necessary parties to the action. See Section 91 of the Probate Act. (Ill. Rev. Stat. 1969, ch. 3, par. 91.) However, they should not be defaulted for failure to appear or file a responsive pleading. Even if an order of default had been en-

tered, it would have availed petitioner nothing, as it would not have afforded a proper basis for depriving those beneficiaries of their bequests if the will was otherwise sustained as valid.

The decision of the circuit court is affirmed.

Affirmed.

ENGLISH and LORENZ, JJ., concur.